631 A.2d 485

**BITS "N" BYTES COMPUTER SUPPLIES, INC.**

v.

**The CHESAPEAKE & POTOMAC TELEPHONE COMPANY OF MARYLAND.**

**No. 48, Sept. Term, 1993.**

Court of Special Appeals of Maryland.

Oct. 4, 1993.

As Amended Oct. 27, 1993.

558

560

John W. Hermina (Hermina & Hermina, on the brief) Laurel, for appellant.

Eric B. Yarvin (Lester B. Seidel and Protas & Spivok, Chartered, on the brief) Bethesda, for appellee.

Argued before BLOOM, FISCHER and MOTZ, JJ.

MOTZ, Judge.

During 1985 and 1986, appellant, Bits "N" Bytes Computer Supplies, Inc. (BNB), entered into a series of directory advertising contracts with appellee, The Chesapeake & Potomac Telephone Company of Maryland (C & P), for advertisements in various yellow page telephone directories owned by C & P. BNB also purchased telephone service from C & P. On January 28, 1988, C & P filed suit against BNB in the District Court of Maryland, asserting that BNB failed to pay "statement[s] of accounts" submitted to it by C & P and so owed C & P $8,918.18. BNB filed a notice of intent to defend and a request for a jury trial. The case was transferred to the Circuit Court for Montgomery County where C & P filed its complaint and a motion for summary judgment, asserting once again that $8,918.18 was due and owing from BNB. This entire amount was owing on unpaid directory advertising bills, rather than on telephone service bills.

In response, BNB filed an extensive answer, an opposition to the motion for summary judgment, and a three-count

counterclaim. BNB asserted that C & P, a public utility, was "regulated by the Maryland Public Service Commission" (PSC), and that in violation of a regulation of the PSC, COMAR 20.45.04.07(D), C & P wrongfully interrupted telephone service to BNB when BNB did not pay its outstanding bill for directory advertising. BNB further asserted that C & P falsely advised BNB that C & P had a right to interrupt BNB's telephone service if BNB failed to pay its directory advertising bill, which led BNB to terminate its Baltimore area telephone service. Additionally, BNB asserted that C & P's "illegal threats and false claims" constituted a breach of its directory advertising contracts with BNB and caused BNB to suffer "a substantial loss of profits, as well as other incidental and consequential damages." BNB asked that its directory advertising contract with C & P be rescinded (Count I), or alternatively that BNB be awarded "consequential damages of $20,000" and "incidental damages of $5,000 and costs" sustained because of C & P's breach of the contracts (Count II). Finally, BNB asserted that C & P's "threat to interrupt service and actual interruption" of BNB's service "constituted intentional interference with [BNB's] business relations and prospective advantage" because, as C & P "well knew," BNB's business "was primarily conducted on the telephone"; on this count (Count III) BNB claimed "consequential damages of $20,000, incidental damages of $5,000 and punitive damages of $1,000,000 and costs." C & P's motion for summary judgment was denied on June 21, 1988.

On that same day, C & P moved to dismiss BNB's counterclaim, arguing that BNB's asserted failure to exhaust its administrative remedies before the PSC meant that the circuit court lacked subject matter jurisdiction over the counterclaim. After extensive briefing of these points and oral argument by counsel for both C & P and BNB, on October 19, 1988, the circuit court (Raker, J.) granted C & P's motion to dismiss the counterclaim "pursuant to Maryland Rule 2–322(b)(1) for lack of subject matter jurisdiction because of Bits "N" Bytes Computer Supplies, Inc.'s failure to exhaust administrative

remedies." C & P's complaint remained in the circuit court and discovery proceeded on the claim stated in it.

On May 25, 1989, BNB filed a complaint with the PSC, alleging *inter alia* essentially the same facts as originally alleged in its circuit court counterclaim. BNB asked the PSC to "[f]ind that C & P violated.... COMAR, Section 20.45.04.-07(D) in that [C & P] threatened to and did, in fact, interrupt plaintiff's telephone service for failure to pay directory advertising charges," to "[o]rder C & P to comply with the aforesaid section[s] of COMAR" and to "[p]rovide such other and further relief as the nature of the case may require."[1] On August 3, 1989, the PSC directed C & P to satisfy or answer the complaint. C & P did subsequently answer the complaint.

On December 10 and 11, 1990, the PSC hearing examiner conducted a hearing on these issues. On August 1, 1991, the examiner issued a 36 page proposed order in which he found, *inter alia*, that C & P did not falsely advise BNB that C & P had the right to terminate BNB's telephone service for failure to pay advertising charges, leading BNB to cancel this service. The examiner did find, however, that C & P's failure to distinguish directory advertising charges "from the other telephone charges at the time of initial interruption of service on August 19, 1986 resulted in BNB's telephone service being interrupted for non-payment of directory charges, which is in violation of the COMAR restrictions."

The examiner also stated that "while this proceeding concerns the various complaints by BNB regarding the alleged

---

1. The PSC hearing examiner stated in his proposed order that BNB's complaint "notes that it has been brought in this administrative forum [after] a judicial suit in the Circuit Court for Montgomery County (Civil No. 31210) based on the alleged violations was dismissed due to failure to exhaust administrative remedies. Therefore, the Complainant [BNB] states that a formal decision by the [PSC] is sought so that a determination of these issues can bind the Circuit Court on issues raised in the complaint." The copy of BNB's PSC complaint provided to us in the record herein does not contain any such assertion by BNB. We note, however, that the record indicates that BNB amended its PSC complaint; accordingly, this language may appear in an amended complaint not contained in the record of this case.

improper actions of C & P, there is a judicial proceeding pending between the parties in Montgomery County wherein the question of damages, if any, will be resolved. Thus, the focus of the instant proceeding before the Commission is to determine the propriety of C & P's actions rather than to make findings regarding damages." Similarly, at the conclusion of his proposed order, the examiner explained that he did not address BNB's behavior in failing to pay its bills because, "the jurisdiction of the Commission in this proceeding is limited to the matters of complaint that have been raised" and "the jurisdiction of the Commission is limited to supervisory and regulatory powers over public service companies." As far as PSC sanctions against C & P, the examiner concluded that "on a prospective basis, C & P should first separate [directory advertising] charges prior to any disconnections for nonpayment even before the customer has raised such an issue," and that "no sanctions or other action need be invoked at this time as this matter [violation of the COMAR regulation] has never been specifically addressed prior to this case."

C & P appealed the proposed order to the PSC itself. Although the Commission noted that C & P disagreed with "some aspects" of the proposed order, "the only aspect" it appealed was the hearing examiner's recommendation that C & P separate its bills; C & P asserted that this was impossible. BNB also appealed to the PSC, asserting *inter alia* that (1) because the facts found by the PSC were to be determinative in its civil suit for damages, it was "critical" that the actual duration of the interruption of service be determined, and (2) the PSC should impose sanctions on C & P for violation of the PSC regulation. On October 10, 1991, the PSC issued an Order modifying the hearing examiner's proposed order by granting C & P some modest relief (less than C & P requested) from the burden of separating bills. In all other respects, the PSC confirmed the proposed order of the hearing examiner. In doing so, the PSC noted:

> [W]hile this complaint was filed for the purpose of exhausting administrative remedies, the Commission is not a fact finder for purposes of civil litigation. In a complaint based

on a violation of the PSC Law or regulations, the Commission or the Hearing Examiner will determine facts which are necessary to establish a violation [o]f or compliance with COMAR regulations.

A week later, on October 17, BNB moved for reconsideration before the PSC on the imposition of sanctions; that motion was denied on February 27, 1992. Neither party sought judicial review of the PSC order.

On April 20, 1992, BNB moved in the circuit court that Counts II and III of the counterclaim (claiming damages for breach of contract and for tortious interference with business advantage, respectively) be reinstated. BNB never asked that its recision claim (Count I) be reinstated. C & P opposed the motion, asserting that BNB still had failed to exhaust its administrative remedies. The circuit court denied BNB's motion to reinstate two counts of its counterclaim.

Trial on the claim set forth in C & P's original complaint was set for September 14, 1992. On the day of trial, C & P again moved for summary judgment. C & P asserted, *inter alia,* that (1) because BNB's counterclaim had been dismissed and not reinstated, BNB could not raise "defensively" any of the issues raised in the counterclaim, even though those issues had also been set forth in BNB's answer to the complaint, and (2) all material facts were undisputed and C & P was entitled to judgment, as a matter of law, as to $8,291.08 (C & P decided not to proceed on its claim to one portion of the bill, thus lowering its demand from $8,918.18 to $8,291.08). After hearing argument of counsel for both sides, the circuit court granted summary judgment to C & P in the amount of $8,142.92, thus allowing BNB to set off against the claimed charges $148.16, which represents a pro rata deduction of its bills for directory advertising and telephone service for the three days it was without telephone service.

On appeal BNB raises five questions:

1. Did the court err in dismissing BNB's counterclaim for failure to exhaust administrative remedies?

2. Is the administrative remedy before the PSC exclusive as to the causes of action in the Counterclaim?

3. Did BNB "exhaust" its administrative remedies?

4. Did the court err in dismissing BNB's motion to reinstate its Counterclaim after Public Service Commission proceedings were concluded and a final PSC Order was entered finding that C & P had improperly interrupted BNB's service?

5. Did the court err in granting C & P summary judgment?

### (i)

BNB's first four questions all involve issues concerning the asserted necessity for BNB to exhaust administrative remedies and its alleged failure to do so. The first is directed at the trial court's original dismissal of BNB's counterclaim. BNB concedes before us that its counterclaim was based "on the contention that C & P's interruption of service due to unpaid directory advertising was improper as being a violation of applicable regulations."[2] BNB asserts, however, that the "thrust" of its counterclaim was not a complaint about service but "to make legal claims" and so the "determination of whether C & P's interruption of service" violated the PSC regulation "could properly have been made by the court as a matter of law, or by the jury either purely as a matter of fact or as a mixed question of law and fact." Specifically, BNB argues it need not have exhausted administrative remedies before the PSC because (1) administrative expertise was not necessary for determination of this case and (2) the administrative remedy was inadequate because the PSC could not award money damages. C & P counters that the Public Service Commission Act, Md.Code (1957, 1991 Repl.Vol., 1992 Cum.Supp.) Art. 78, §§ 1–107 (hereinafter Art. 78) sets forth a

---

2. Moreover, in the court below, BNB acknowledged that "each count [of its counterclaim] alleges that C & P's wrongful violations of a Public Service Commission (PSC) regulation was the *cause* of the breach or intentional interference." (emphasis added).

"comprehensive and detailed administrative machinery for the regulation of public utilities throughout the State," *Spintman v. Chesapeake & Potomac Tel. Co. of Maryland,* 254 Md. 423, 427, 255 A.2d 304 (1969), and that BNB was required to exhaust its remedies pursuant to this "machinery," and that the circuit court lacked jurisdiction over the counterclaim because BNB failed to do so. C & P further asserts that the PSC clearly had jurisdiction over the counterclaim because the counterclaim concededly was based on a PSC regulation and no exception to the exhaustion doctrine is applicable here.

Contrary to the finding of the circuit court and argument of C & P, the requirement that administrative remedies be exhausted "is not ordinarily a limitation upon the subject matter jurisdiction of a trial court." *Maryland Nat'l Capital Park & Planning Comm'n v. Crawford,* 307 Md. 1, 13 n. 4, 511 A.2d 1079 (1986). Thus, a court is usually not without subject matter jurisdiction to consider an original civil suit brought by a party who has failed to exhaust his exclusive administrative remedies. Because, however, of the public policy underlying the exhaustion doctrine, *i.e.,* it "produces the most efficient and effective results," *Secretary, Dep't of Human Resources v. Wilson,* 286 Md. 639, 645, 409 A.2d 713 (1979), exhaustion "is for some purposes treated *like* a jurisdictional issue." *Crawford,* 307 Md. at 13 n. 4, 511 A.2d 1079. (emphasis in original). *Accord, Board of Educ. for Dorchester County v. Hubbard,* 305 Md. 774, 787, 506 A.2d 625 (1986). That is, "trial courts generally should not act until there has been compliance with the statutory comprehensive remedial scheme" and "an appellate court ... will raise the issue of exhaustion ... even though not raised by the parties." *Wilson,* 286 Md. at 645, 409 A.2d 713. Accordingly, when a party attempts to bring a judicial action without exhausting exclusive administrative remedies, a trial court properly should dismiss the case. *See, e.g., Quesenberry v. Washington Suburban Sanitary Comm'n,* 311 Md. 417, 426, 535 A.2d 481 (1988) (containing mandate remanding to circuit court for the entry of an order "dismissing the case for failure to exhaust administrative remedies"); *Maryland Comm'n on Human*

*Relations v. Mass Transit Admin.*, 294 Md. 225, 235, 449 A.2d 385 (1982) (containing mandate remanding to circuit court "with directions to dismiss the bill of complaint"); *Wilson*, 286 Md. at 647, 648, 409 A.2d 713 (same). Therefore, although the circuit court did not lack subject matter jurisdiction over the counterclaim, its decision to dismiss the counterclaim was nonetheless correct if BNB failed to exhaust its administrative remedies.

The general exhaustion rule is that "where a statute provides a special form of remedy, the plaintiff must use that form [of remedy] rather than any other[.]" *Soley v. State Comm'n on Human Relations*, 277 Md. 521, 526, 356 A.2d 254 (1976) (citations omitted). The statute involved here, the Public Service Commission Act, provides that C & P, as a "public service company," is under the "jurisdiction" of the PSC, which is specifically empowered to "supervise and regulate" it. Art. 78, § 1 and § 56. Moreover, the Act authorizes the PSC to "enforce compliance by such companies with all the requirement of law, including . . . requirements with respect to . . . service," *id.*, § 56, and provides that the PSC has "all implied and incidental powers necessary and proper to carry out effectually the provisions of [the Act]" and that these powers are to be "liberally construed." *Id.* § 1. Further, the PSC is specifically empowered to make and enforce regulations "necessary to carry out the provisions of the [Act]," including "standards of safe, adequate, reasonable, and proper service." *Id.* §§ 64 and 73. The PSC is to receive all complaints alleging a violation of the Act (including the regulations promulgated pursuant to it) and "take final action" directing "full or partial satisfaction" or "such action as may be warranted." *Id.* § 77(a)(d). "In any contested case begun by complaint, filed by any person or by the Commission, the person complained of shall be entitled to a hearing," *id.* § 79; any party to a proceeding has the "right to summon witnesses, present evidence," cross examine witnesses, take depositions etc. *Id.* § 82. "Any party or any person in interest" dissatisfied with a final PSC decision is entitled to judicial review of that decision. *Id.* § 90. The Public Service Commission Act

thus provides (1) the PSC with the power, *id.* § 64 and § 73, to create the very regulation that forms the basis of the rights asserted in BNB's counterclaim, COMAR 20.45.04.07(D), and (2) a specific form of remedy, *id.* §§ 77(a) and (d), 82, and 90 to pursue violations of that regulation. In sum, the Act provides a special statutory remedy that ordinarily must be exhausted.

BNB virtually concedes as much but asserts that exhaustion is not required here because of two "well recognized exceptions" to the exhaustion rule. In *Prince George's County v. Blumberg,* 288 Md. 275, 284–85, 418 A.2d 1155, *cert. denied,* 449 U.S. 1083, 101 S.Ct. 869, 66 L.Ed.2d 808 (1980) the Court of Appeals definitively explored exceptions to the exhaustion doctrine. BNB invokes the fourth and fifth *Blumberg* exceptions, *i.e.,*

4. Where the administrative agency cannot provide to any substantial degree a remedy.

5. When the object of, as well as the issues presented by, a judicial proceeding only tangentially or incidentally concern matters which the administrative agency was legislatively created to solve, and do not, in any meaningful way, call for or involve applications of its expertise.

288 Md. at 285, 418 A.2d 1155 (citations omitted). Neither of these exceptions is applicable here.

Notwithstanding BNB's protestations that no PSC expertise was necessary to interpret the PSC regulation, it seems to us virtually self-evident that an administrative agency, particularly one with the specialized responsibility of the PSC, does have special expertise in interpreting its own regulations. *See generally Spintman v. Chesapeake & Potomac Tel. Co. of Maryland,* 254 Md. 423, 255 A.2d 304 (1969). *See also, Maryland Comm'n on Human Relations v. Bethlehem Steel Corp.,* 295 Md. 586, 593, 457 A.2d 1146 (1983) ("A question concerning the interpretation of an agency's rule is as central to its operation as an interpretation of the agency's governing statute" and "the agency's expertise is more pertinent to the

interpretation of an agency's rule than to the interpretation of its governing statute.")

Nor does the fact that the PSC may be unable to grant BNB money damages mean that BNB's administrative remedy is inadequate. As the Court of Appeals recently explained, "[i]t is a settled principle of administrative law that an agency's lack of power to grant the particular type of relief sought does not necessarily mean that the agency lacks jurisdiction over a matter or that the administrative remedy need not be invoked and exhausted." *McCullough v. Wittner,* 314 Md. 602, 608, 552 A.2d 881 (1989). *See also,* 3 Davis, *Administrative Law Treatise* § 19.07 (1958). Assuming without deciding that the PSC lacks this power,[3] BNB still was required to pursue its special statutory administrative remedy.

*McCullough* is instructive. There the Court similarly "assumed arguendo that the Inmate Grievance Commission [did] not have the statutory authority to make a monetary award" but could "only issue directives and orders of an equitable nature." 314 Md. at 608, 552 A.2d 881. Nevertheless, the *McCullough* court concluded that an inmate claiming money damages from the Commission "was required to invoke and exhaust" his statutory administrative remedy. *Id.* at 610, 552 A.2d 881. We recognize that the statute at issue in *McCullough,* Maryland Code (1957, 1986 Repl.Vol., 1988 Cum. Supp.), Art. 41, § 4–102(*l* ), contained a specific mandate that an inmate invoke and exhaust administrative remedies, and that there is no comparable statutory mandate here. It seems to us, however, that this specific statutory mandate was not critical to the result reached in *McCullough.* Rather, we believe the teaching of *McCullough* is that when, as here, an applicable, special statutory remedy is available, an administrative agency's lack of power to award certain forms of relief

---

**3.** C & P asserts that, in the proper case, the PSC can award money damages for violation of one of its regulations. We need not determine here whether the PSC has this power because the PSC apparently concluded it did not have such power in this case and no party sought judicial review of that finding.

sought by a party does not relieve the party of its obligation to "invoke and exhaust" the administrative remedy. This conclusion is consistent with the general rule that "absent a legislative indication to the contrary, it will usually be deemed that the Legislature intended" a special statutory remedy to be exhausted. *White v. Prince George's County,* 282 Md. 641, 649, 387 A.2d 260 (1978). *See Magan v. Medical Mutual Liability Ins. Society of Md.,* 81 Md.App. 301, 309, 567 A.2d 503 (1989).

Thus, the circuit court did not err in dismissing BNB's counterclaim for failure to exhaust administrative remedies.

### (ii)

BNB's second, third and fourth questions all involve the circuit court's refusal to reinstate BNB's counterclaim after it obtained a final order from the PSC. BNB argues that it fully exhausted its administrative remedy and that this remedy was not exclusive. C & P counters by asserting BNB did not exhaust its administrative remedy because it failed to obtain judicial review of the PSC order and "[b]ecause BNB did not raise (and, therefore, waived) the PSC remedial powers issues at the PSC ... this case does not really present the issue of exclusivity of the remedy at the PSC level" and so "[t]his Court must await another day ... to tackle that thorny issue." The parties' phrasing of their arguments reflects a fundamental misunderstanding of the exhaustion doctrine.

Pursuant to the doctrine of exhaustion of administrative remedies, a party's *exclusive* initial remedy is the statutorily proscribed administrative procedure; usually, as here, a party's only recourse to the courts is by limited judicial review of the administrative procedure.[4] Thus, we can hardly wait to "another day" to determine if the PSC remedy is exclusive; we have already determined that question. As Judge Levine

---

4. If there is no statutory provision for judicial review, there is, of course, nonetheless a right to it *via* mandamus, injunction, or certiorari. *See Criminal Injuries Bd. v. Gould,* 273 Md. 486, 502–04, 331 A.2d 55 (1975); *Heaps v. Cobb,* 185 Md. 372, 379–80, 45 A.2d 73 (1945).

explained, the doctrine of exhaustion of administrative remedies "demands that a party fully pursue administrative procedures before obtaining limited judicial review and contemplates a situation in which the claim asserted is enforceable initially by administrative action *exclusively*." *Maryland Nat'l Capital Park & Planning Comm'n v. Washington Nat'l Arena*, 282 Md. 588, 602, 386 A.2d 1216 (1978) (emphasis in original). *See also, White v. Prince George's County*, 282 Md. 641, 649, 387 A.2d 260 (1978). Thus, when a party is provided with a statutory administrative remedy, which the legislature intended to be exclusive, a claim must be asserted initially before the administrative agency and the *only* judicial relief as to that claim is "limited judicial review" of the final administrative decision.[5] When the exhaustion doctrine is applicable, there is no right to assert a claim or counterclaim in an independent civil action after the administrative remedy has been exhausted. We repeat, the only opportunity for judicial consideration of a claim to which the exhaustion doctrine is applicable is through limited judicial review of the final administrative decision.

The parties' confusion on this point may stem from the term "exhaustion" itself which perhaps implies, incorrectly, that independent judicial action always can be pursued after an administrative remedy is exhausted. This confusion is also evident in loose language in some appellate opinions. *See, e.g., Wilson*, 286 Md. at 647, 409 A.2d 713. ("The claimants failed to exhaust the effective, available [administrative] remedy . . .

---

5. *Spintman v. C & P Tel. Co.*, 254 Md. 423, 255 A.2d 304 (1969) is entirely consistent with this holding. There the Court held that plaintiffs could not challenge the reasonableness of rates charged by a utility in an original judicial action; under the exhaustion doctrine, their exclusive remedy was before the PSC. In dicta the *Spintman* Court noted that it was *not* "confronted with a situation where the consumer was charged a rate not in conformity with the established and published tariff set by the Commission or where there was error in the computation or application of the established rate. In such a situation an action in assumpsit may well be the proper remedy for the collection of an overcharge[.]" 254 Md. at 429, 255 A.2d 304. We are similarly not confronted with this situation.

*before seeking declaratory relief from the trial court."*) (emphasis added). Nonetheless, it is well established that "where a statute provides a special form of remedy, the plaintiff must use that form rather than any other ... and if he is unsuccessful, he must seek the judicial review provided by the Legislature *rather* than invoke the ordinary jurisdiction of the courts." *Soley,* 277 Md. at 526, 356 A.2d 254. (emphasis added) (citations omitted); *see also, Lee v. Secretary of State & Mahoney,* 251 Md. 134, 139, 246 A.2d 562 (1968).[6]

Thus, when the exhaustion doctrine is applicable, exhaustion of an administrative remedy means only that a party has obtained a final administrative decision and can now pursue limited judicial review of that decision. *See Maryland Comm'n on Human Relations v. Baltimore Gas & Elec. Co.,* 296 Md. 46, 459 A.2d 205 (1983). A party who has an exclusive administrative remedy cannot, by pursuing every administrative level of that remedy, and thus exhausting the remedy, gain the right to bring an independent judicial action.

It is only when the doctrine of primary jurisdiction is involved that a party's complete pursuit of his administrative remedy permits him then to pursue his independent

---

6. The cases relied on by BNB, in which utilities were sued in ordinary civil actions, do not suggest a contrary conclusion. In none of them were the claims asserted against the utility based on an alleged regulatory violation; rather, in each there was an independent common law basis for the claim. *See Potomac Elec. Power Co. v. Smith,* 79 Md.App. 591, 558 A.2d 768 (negligence, not regulatory violation, basis of suit), *cert. denied,* 317 Md. 392, 393, 564 A.2d 407 (1989), *overruled by, United States v. Streidel,* 329 Md. 533, 620 A.2d 905 (1993) (overruled on unrelated grounds); *Singer Co. v. Baltimore Gas & Elec. Co.,* 79 Md. App. 461, 558 A.2d 419 (1989) (breach of contract and negligence, not regulatory violation, basis of suit); *Potomac Edison Co. v. Burdette,* 70 Md.App. 566, 521 A.2d 1276 (1987) (negligence, not regulatory violation, basis of suit). If the C & P conduct objected to by BNB had constituted wrongful conduct separate and apart from any PSC regulation—for example, if it constituted negligence even absent the PSC regulation—then the exhaustion doctrine might not be applicable. This is, however, not the situation here. The *only* reason the disruption of telephone service was assertedly illegal was because it violated a PSC regulation. Under such circumstances, the exhaustion doctrine was clearly applicable.

judicial remedy. Primary jurisdiction "is a judicially created rule designed to coordinate the allocation of functions between the courts and administrative bodies." *Maryland Nat'l Cap. Park & Planning Comm'n,* 282 Md. at 601, 386 A.2d 1216 (citations omitted). This doctrine "comes into play when a court and agency have [initial] *concurrent jurisdiction* over the same matter and there is no statutory provision to coordinate the work of the court with that of the agency." *Id.* (emphasis added) (internal citation omitted). In such situations, it has occasionally been held "that the administrative remedy is not primary and resort may be had to the concurrent judicial remedy without invoking or exhausting the administrative procedures." *Hubbard,* 305 Md. at 785–86, 506 A.2d 625. *See, e.g., Crawford,* 307 Md. at 23, 511 A.2d 1079; *Maryland Nat'l Capital Park & Planning Comm'n,* 282 Md. at 602, 386 A.2d 1216. The courts, however, "have ordinarily construed the pertinent enactments to require that the administrative remedy be first invoked and followed." *Hubbard,* 305 Md. at 786, 506 A.2d 625 (citations omitted). *See, e.g., Clinton v. Board of Educ. of Howard County,* 315 Md. 666, 678, 556 A.2d 273 (1989).[7] Accordingly, full pursuit of administrative remedies is also a matter of importance when the doctrine of primary jurisdiction is invoked and thus "exhaustion" of administrative remedies is often discussed in those cases. *See, e.g., Hubbard,* 305 Md. at 792, 506 A.2d 625 (finding court should not have entertained independent court action "until the teachers pursue and *exhaust* their administrative remedy") (emphasis added).

 The discussion of "exhaustion" of administrative remedies in the primary jurisdiction cases has undoubtedly contributed to the parties' confusion as to what can be obtained by exhausting administrative remedies when the exhaustion

---

7. Thus, when the primary jurisdiction doctrine in invoked, and a party has failed to pursue and complete his primary (but not exclusive) administrative remedy but instead attempts to bring an independent judicial action, a court will remand to the agency so that it can determine the question *in the first instance. See Hubbard,* 305 Md. at 792, 506 A.2d 625; *Clinton,* 315 Md. at 679, 556 A.2d 273.

doctrine itself is applicable. Moreover, the primary jurisdiction cases are somewhat unclear as to what constitutes a sufficient pursuit, or "exhaustion," of administrative remedies prior to invoking an independent judicial action. *Compare Hubbard,* 305 Md. at 792, 506 A.2d 625 ("*[O]nce* these statutory interpretation questions have been *resolved through* the administrative *and judicial review* process" a litigant can invoke his independent judicial remedy) (emphasis added) *with Clinton,* 315 Md. at 679, 556 A.2d 273 ("[I]f the State Board decision is adverse to [litigants], and they choose to seek judicial review of that decision, *that review could then be consolidated with the instant case.*") (emphasis added) (citations omitted). We need not address that problem, of course, because the primary jurisdiction doctrine is inapplicable here.[8] As explained above, it is crystal clear that when, as here, the exhaustion doctrine, rather than the primary jurisdiction doctrine, applies, no matter how completely a party exhausts his administrative remedies, the only judicial relief to which he is entitled is judicial review of the final administrative decision.

BNB did obtain a final administrative decision but it did not seek judicial review of that decision. Contrary to the parties' view, however, it is not BNB's failure to seek judicial review of the PSC decision that is determinative as to whether BNB can assert its counterclaim in an independent civil action. Rather, BNB cannot assert its counterclaim, just as it could not bring an independent civil action, because its statutory remedy before the PSC, complete with limited judicial review, is its exclusive remedy. Although this rule may, at first blush, seem harsh, it is, on reflection, entirely just. Without the regulation promulgated by the PSC, BNB would have no basis for asserting any of the arguments made in the counterclaim. There is certainly nothing in the common law that prevents a company from discontinuing one kind of service if a customer

---

**8.** Not even BNB argues to the contrary. The primary jurisdiction doctrine is inapplicable because no judicial forum was initially available to resolve whether the PSC regulation had been violated, and so no court had initial "concurrent jurisdiction," *Maryland Nat'l Capital Park & Planning Comm'n,* 282 Md. at 601, 386 A.2d 1216, with the PSC.

fails to pay for another kind of service. It is only because of the PSC regulation that BNB has any argument that C & P's set off was improper. Surely, there is no injustice in requiring that a party's exclusive remedy for violation of a right created by an administrative agency's regulation be through the administrative procedures that the legislature has created for determination of such disputes. *See White,* 282 Md. at 650–651, 387 A.2d 260; *Magan,* 81 Md.App. at 308–309, 567 A.2d 503. *See also, Veydt v. Lincoln Natl. Life Ins. Co.,* 94 Md.App. 1, 14–15, 614 A.2d 1318 (1992).

Because the BNB's remedy before the PSC was exclusive, the circuit court did not err in refusing to reinstate BNB's counterclaim.

### (iii)

██ The final question presented concerns the grant of C & P's motion for summary judgment on its original claim for money assertedly due and owing for directory advertising. This claim is based on certain directory advertising contracts between C & P and BNB and monies BNB failed to pay on those contracts after September 26, 1986. BNB's President admitted in deposition that he executed those contracts, that the advertisements were printed correctly, and that BNB paid C & P no monies due on those contracts after September 26, 1986. On the basis of this deposition testimony and the contracts themselves, C & P moved for summary judgment on the day of trial.[9] C & P conceded, as the PSC had found, that it discontinued BNB's telephone service for three days in

---

9. Although a motion for summary judgment can be made at any time in a proceeding when it appears that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law, *Myers v. Montgomery Ward & Co.,* 253 Md. 282, 289–90, 252 A.2d 855 (1969), a party is ordinarily entitled to 15 days to respond to a summary judgment motion. *See* Md. Rule 2–311(b). Here, this time period was not shortened by order of court, *see* Md. Rule 1–204, yet BNB was not given any time to respond to the motion that C & P filed the day of trial. BNB, however, did not assert in the circuit court and does not assert before us, that the grant of summary judgment was improper *for this reason.* Thus, that question is not before us.

violation of the PSC regulation, and agreed that BNB was entitled to a setoff of $148.16, which represented a pro rata deduction of its bills for directory advertising and telephone service for the three days BNB was without telephone service. C & P maintained, however, that, as a matter of law, this three-day discontinuance of service did not constitute a material breach of the directory advertising contracts entitling BNB to cease payment on those contracts. The circuit court granted C & P's motion for summary judgment concluding "as a matter of law that this three-day interruption of the services was not a material breach of the contract so as to allow [BNB] to simply get out of having to pay the balance of the contract...."

BNB repeatedly suggests that the grant of summary judgment in September, 1992 was improper because an earlier motion for summary judgment, filed by C & P with its complaint, was denied four years earlier, on June 21, 1988. Contrary to BNB's suggestion, it is well established that "there is ordinarily no impropriety in submitting a second motion for summary judgment after a prior motion has been denied where there has been some change of fact or law which substantially justifies the resubmission." *Yamaner v. Orkin,* 313 Md. 508, 516, 545 A.2d 1345 (1988). Here, after the first summary judgment motion was denied, the parties engaged in discovery. One of the fruits of that discovery, the deposition of BNB's President, supported C & P's second motion. Accordingly, as in *Yamaner,* "[f]rom the standpoint of evidentiary material submitted in the record," the facts had changed. *Id.* Thus, there was no impropriety in granting C & P's second summary judgment motion even though its first summary judgment motion had been denied.

BNB also asserts that "summary judgment was precluded by disputes of material fact as to BNB's defenses [1] that it was not indebted as alleged, [2] that it paid its 1985 and 1986 Richmond Yellow Pages advertisements, [3] that its obligation on these contracts was extinguished due to C & P actions in terminating service, and [4] that the contracts had been

cancelled." As to the first "disputed fact," as noted above, BNB's President conceded in deposition that he had executed the directory advertising contracts "indebt[ing]" BNB to C & P, and that BNB had not paid the amounts allegedly due and owing. As to the second "disputed fact," it is uncontroverted that C & P dropped its claim to amounts due on the 1985 and 1986 Yellow Pages advertisements and, thus, no dispute as to them was relevant to the summary judgment motion. As to the fourth "disputed fact," the directory advertising contracts that BNB conceded it had executed with C & P provided that an advertiser could only terminate by notifying C & P in writing at least 30 days prior to a "closing date." BNB conceded that its written attempt to cancel the contracts was mailed two months *after* the last "closing date" and that its oral attempt to cancel was made at least 6 weeks after the last "closing date." Thus, the first, second, and fourth facts, characterized as "disputed" in BNB's appellate brief, are actually not disputed or, in the case of the second, not material.

The third "fact," that BNB's obligations under the contracts were extinguished due to C & P's interruption of its telephone service for three days, is not a dispute of fact at all but a legal dispute. Indeed, counsel for BNB, at what BNB characterizes as the "extensive" summary judgment hearing, was specifically asked and answered:

THE COURT: First you have the advertising contract, and that is what this suit is founded upon, that he took out the advertising; he didn't pay for it. Now what facts are in dispute in that regard?

[BNB COUNSEL]: *There are no facts in dispute about*—as [C & P's counsel] pointed out, we agree that all these contracts were taken out, all those technical terms there. What *we are saying is that because of C & P's material breach by interrupting service, which was unlawful—*

THE COURT: The contract wasn't for providing telephone service; it was providing advertisement.

[BNB COUNSEL]: Right.

THE COURT: He had provided the advertisement. There was no breach of the advertisement.

[BNB COUNSEL]: There was a breach, Your Honor.

THE COURT: What was that?

[BNB COUNSEL]: When they denied you the ability to use your advertising by eliminating your service, they are breaching that contract. Just as [C & P's counsel] pointed out, if they had terminated his service completely, anybody could call that number that is in the book, but they couldn't get it.

It is the same effect for the three-day period.

THE COURT: All right.

[BNB COUNSEL]: That destroyed the usefulness of the advertising. It was as if it didn't exist for that three-day period.

(emphasis added). Similarly, BNB's counsel later conceded:

I think, Your Honor, it boils down to your decision if you believe that there was no material breach or no breach of contract.[10]

Thus, the only substantive argument BNB made below, and the only one it makes before us, as to why summary judgment was improper is that the circuit court was incorrect, as a matter of law, in concluding that C & P's conceded interruption of telephone service to BNB for three days in violation of the PSC regulation, did not constitute a material breach of the directory advertising contract. This is, of course, a legal argument. BNB concedes as much in its reply brief but claims that even though a "mere 'legal proposition'" may be involved, this was a "core matter," for which BNB had "exhausted burdensome administrative remedies" and so it "required and deserved utmost attention," attention it could

---

10. BNB's appellate counsel did not represent the company below.

somehow not receive on consideration of a summary judgment motion.

There is simply no support for such an argument. As we explained in *Seaboard Surety v. Kline, Inc.*, 91 Md.App. 236, 603 A.2d 1357 (1992), summary judgment is no longer a "procedural step-child, disfavored and not permitted out in polite society." *Id.* at 242, 603 A.2d 1357. Thus, "[t]he Supreme Court and the Court of Appeals have, in recent years, emphasized that a trial court should not be reluctant to grant a motion for summary judgment in an appropriate case." *Bond v. NIBCO, Inc.*, 96 Md.App. 127, 134, 623 A.2d 731 (1993). Indeed, the Supreme Court, in a trilogy of cases decided in 1986, specifically noted that summary judgment was not a "disfavored" remedy; rather, the federal rule "*mandates* the entry" of summary judgment when there is no dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 327, 106 S.Ct. 2548, 2552, 2555, 91 L.Ed.2d 265 (1986) (emphasis added). *See also, Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). We noted in *Seaboard Surety* that, although the Court of Appeals had not then explicitly adopted the trilogy's reasoning, it had long recognized that the summary judgment rule "means precisely what it says." *Seaboard Surety*, 91 Md.App. at 242, 243 n. 2, 603 A.2d 1357. We thus surmised that the teaching of the Supreme Court trilogy, interpreting the federal summary judgment rule, was entirely consistent with Court of Appeals' cases interpreting the Maryland rule, which were derived from the federal rule. *Id.* Recently, in fact, the Court of Appeals did expressly cite, quote and rely on the Supreme Court trilogy. *Beatty v. Trailmaster*, 330 Md. 726, 738–9, 625 A.2d 1005 (1993) Thus, contrary to BNB's suggestion, there can be no doubt that in any case—even those involving "core" matters—it is entirely proper that a party move for summary judgment, and that the case be decided on that basis if there is no dispute as to a material

fact. In such circumstances, the only thing the moving party must show is that it is "entitled to judgment as a matter of law," *i.e.*, that its legal argument is correct.

Accordingly, we turn to the question of whether C & P, the moving party in this case, was entitled to judgment as a matter of law. In its appellate briefs, BNB never focuses on this ultimate question. Below, it maintained that C & P's disruption of its telephone service for three days constituted a breach, indeed a material breach, of the directory advertising contracts, which permitted it to "rescind all such contracts." [11] The circuit court rejected this argument reasoning that, since the provision of telephone service was no part of the directory advertisement contracts, the interruption of telephone service did not "justify" breach of the directory contracts and was "not a material breach of their advertising agreement." This conclusion was clearly correct. The contracts at issue on which C & P was suing did not refer to, let alone cover, the provision of telephone service; those contracts only concerned directory advertising. C & P's disruption of BNB's telephone service did not breach its directory advertising contracts with BNB. Indeed, as the circuit court noted, "but for the [CO-MAR] regulation" BNB would not have had *any* basis for claiming the telephone disruption was unlawful because without it "the Telephone Company could cancel [BNB's] telephone service for the nonpayment of the advertisement. [O]nly COMAR tells them you cannot do that." [12]

---

**11.** For purposes of this discussion we assume, as the parties seem to, that BNB's failure to request reinstatement of the recision count in its counterclaim does not constitute abandonment of this argument.

**12.** During the summary judgment argument, the circuit court also questioned BNB's counsel as to how BNB would prove any damages from "business loss" because of the interruption of service; the court remarked that such damage claims seemed "awfully speculat[ive]." This comment may well be correct; it was not, however, contrary to some suggestion by BNB, the basis of the grant of the summary judgment. Rather, the court found:

> In the posture the case is at the moment … I will find as a matter of law that this three-day interruption of the services was not a material breach of the contract so as to allow [BNB] to simply get out

(iv)

In summary, we hold that the Public Service Commission Act provides the exclusive remedy for determination of BNB's claims that C & P violated a PSC regulation. For this reason, the dismissal of BNB's counterclaim, based as it was on the asserted violation of this PSC regulation, was proper, and the circuit court's refusal to reinstate the counterclaim was equally proper. Moreover, since the violation of the PSC regulation was not covered by and did not violate the directory advertising contract, it could not constitute a breach of that contract. Thus, the grant of summary judgment on C & P's claims under that contract was also proper.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.

---

of having to pay the balance of the contract to the advertiser, that it would leave him for damages that are recoverable under the law for the wrongful termination under COMAR, which isn't before me.